1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   GERALD HOWARD,                          No.  2:11-cv-0991 JAM CKD P

12                  Petitioner,

13         v.                                 FINDINGS AND RECOMMENDATIONS

14   M. MARTEL,

15                  Respondent.

16

17

18         Petitioner is a state prisoner proceeding through counsel with a petition for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  This action proceeds on the amended petition filed

20   July 20, 2012.  (ECF No. 49-1 ("Ptn.").)  Petitioner challenges his 2008 conviction for first degree

21   murder and theft, for which he was sentenced to a prison term of life without the possibility of

22   parole.  (Id. at 5.)[1]

23         Petitioner claims that: (1) because law enforcement officers obtained his statement in

24   violation of his federal due process rights, the statement should have been suppressed; (2) he was

25   denied his Sixth Amendment right to present a full defense when the trial court excluded

26   exculpatory evidence; and (3) he was denied his Sixth Amendment right to effective assistance of

27

28   _____

     [1] Citations refer to page numbers assigned by the court's docketing system.

                                              1

1  trial counsel when his attorney failed to investigate and present a "diminished actuality" defense.

2      Respondent has filed an answer to the petition (ECF No. 59), and petitioner has filed a

3  traverse (ECF No. 60-1).  Upon careful consideration of the record and the applicable law, the

4  court will recommend that the petition be denied.

5                                   BACKGROUND

6  I.  Facts

7      In its affirmation of the judgment on appeal, the California Court of Appeal, Third

8  Appellate District, set forth the factual background as follows:

> Defendants Gerald Howard and Carmel Murphy lured Donte
> Rogers to a park, shot him in the head and abdomen, and emptied
> the pockets of his pants. In a joint trial with separate juries, Howard
> was found guilty of first degree murder while lying in wait and
> misdemeanor petty theft, both while armed. Murphy was found
> guilty of first degree murder and robbery, both while armed.
>
> . . .
>
>              FACTUAL AND PROCEDURAL BACKGROUND
>
> About 10:30 p.m. one night in February 2005, Rogers drove
> Monica Bracamonte (who was the sister of Rogers's brother's
> girlfriend) to the store in his Cadillac to get some milk for
> Bracamonte's niece.  At the store, Rogers received a phone call
> from Howard to pick him up at Howard's house and take him to the
> park to meet Howard's girlfriend. After picking up Howard, Rogers
> drove with Howard and Bracamonte to the park. At the park,
> Howard walked to a nearby building, talked on the phone for a few
> minutes, came back to the car, and asked Rogers to get out. Rogers
> complied, and he and Howard walked around the building out of
> Bracamonte's sight. Less than five minutes later, Bracamonte heard
> two gunshots.
>
> About 10 minutes after the gunshots, Howard returned to the car
> with Murphy, and he asked Bracamonte to get out of the car.
> Thinking nothing of it, Bracamonte complied. Murphy got in the
> car where Bracamonte had been sitting. Howard told Bracamonte
> that Rogers wanted to speak with her.  As Bracamonte walked to
> the building with Howard behind her, she heard a clicking noise
> and something fall to the ground. She turned around and saw
> Howard, who was now wearing gloves, pick up a gun off the
> ground and place it under his arm. He told her to go back to the car,
> and she complied.
>
> Howard drove Rogers's Cadillac a couple blocks to where
> Murphy's Jeep was parked. Murphy got out of the Cadillac and into
> her Jeep. Murphy followed Howard as he dropped off Bracamonte
> at Bracamonte's sister's apartment. As Bracamonte got out of the

Cadillac, she heard Murphy say, "'Pop her too.'"   When Bracamonte got to the apartment, she told her sister and Rogers's brother what had happened. Rogers's brother tried to call Rogers but received no answer.

Rogers's brother and Bracamonte's sister went to the park and found Rogers's dead body. He had been shot in the back of the head and in the abdomen. His pants were pulled down and one of his pockets turned inside out.

Howard and Murphy were arrested on February 10, 2005. They were interviewed by police separately and then placed in an interview room together.

A

*Howard's Defense*

Howard's defense was that he was the "duped pawn" and Murphy was the "queen."   To support his defense, he introduced the testimony of Tawon Woodruff, who had met Howard on a number of occasions.   According to Woodruff, Howard was "weak-minded," unintelligent, and did things he did not want to do. Howard also introduced the testimony of his sister, Leslie Knight. According to Knight, Howard was slow to understand things and gullible.

People v. Howard, 2010 WL 54290 (Cal. App. 3 Dist. Jan. 8, 2010).  The facts as set forth by the state court of appeal are presumed correct, 28 U.S.C. §2254(e)(1).

II. Procedural History

On March 20, 2008, following a trial, a jury in the Sacramento County Superior Court found petitioner guilty of first degree murder with special circumstance (Cal. Pen. Code § 187) and theft (Cal. Pen. Code § 484).  (Ptn. At 5.)

Petitioner appealed his conviction to the California Court of Appeal, Third Appellate District.  (Ptn. At 6.)  On January 8, 2010, the California Court of Appeal affirmed the judgment. (Id.)  Petitioner then filed a petition for review in the California Supreme Court.  On April 22, 2010, the California Supreme Court denied review.  (Id.)

Proceeding pro se, petitioner commenced this federal action on April 13, 2011.  (ECF No. 1.)  Respondent filed an answer to the original petition.  (ECF No. 16.)  Along with his traverse, petitioner filed a motion for appointment of counsel.  (ECF Nos. 17, 18.)  The court appointed counsel for petitioner on August 26, 2011.  (ECF No. 20.)

3

On July 20, 2012, petitioner through counsel filed a proposed amended petition and a motion to stay this action while he exhausted state remedies as to a new claim that trial counsel was ineffective in failing to present a "diminished actuality" defense.  (ECF No. 49.)  On September 27, 2012, the court granted petitioner's motion and administratively stayed this action pending the exhaustion of state remedies.  (ECF No. 54.)

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, raising the "diminished actuality" claim.  (ECF No. 58.)  Pursuant to a request by the state supreme court under Rule 8.385(b) of the California Rules of Court, both the state Attorney General's office and the Sacramento County Office of the Public Defender filed informal responses to the petition.  (ECF Nos. 58-1, 58-2; see ECF No. 58-4 at 2.)  Petitioner filed a reply to the informal responses.  (ECF No. 58-3.)  On August 14, 2013, the California Supreme Court denied the petition.  (ECF No. 56-1.)

Two weeks later, the undersigned re-opened the instant federal action.  (ECF No. 57.) Respondent filed an answer to the amended petition (ECF No. 59), and petitioner filed a traverse (ECF No. 60-1.)

## ANALYSIS

### I. AEDPA

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

/////

4

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S. Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Accordingly, "a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

/////

5

1    The undersigned also finds that the same deference is paid to the factual determinations of

2    state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

3    subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

4    decision that was based on an unreasonable determination of the facts in light of the evidence

5    presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

6    2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

7    factual error must be so apparent that "fairminded jurists" examining the same record could not

8    abide by the state court factual determination.  A petitioner must show clearly and convincingly

9    that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

10   The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable

11   nature of the state court decision in light of controlling Supreme Court authority.  Woodford v.

12   Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state court's ruling

13   on the claim being presented in federal court was so lacking in justification that there was an error

14   well understood and comprehended in existing law beyond any possibility for fairminded

15   disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  Clearly established" law is law that has

16   been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S.

17   120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as

18   clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not

19   permitting state sponsored practices to inject bias into a criminal proceeding by compelling a

20   defendant to wear prison clothing or by unnecessary showing of uniformed guards does not

21   qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

22   The established Supreme Court authority reviewed must be a pronouncement on constitutional

23   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

24   binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

25   The state courts need not have cited to federal authority, or even have indicated awareness

26   of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8. Where the state

27   courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal

28   court will independently review the record in adjudication of that issue.  "Independent review of

6

1    the record is not de novo review of the constitutional issue, but rather, the only method by which

2    we can determine whether a silent state court decision is objectively unreasonable." Himes v.

3    Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

4        "When a state court rejects a federal claim without expressly addressing that claim, a

5    federal habeas court must presume that the federal claim was adjudicated on the merits – but that

6    presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct.

7    1088, 1096 (2013). "When the evidence leads very clearly to the conclusion that a federal claim

8    was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of

9    the claim. Id. at 1097.

10    II. Petitioner's Claims

11    A. Miranda Violation

12    1. Facts

13        Petitioner claims that, while he was in police custody on February 10 and 11, 2005, law

14    enforcement officers obtained incriminating statements in violation of his Fifth Amendment

15    privilege against self-incrimination. Citing the fact that petitioner was in custody for almost four

16    hours, intermittently interacting with police, before he was read his Miranda[2] rights, petitioner

17    argues that this "midstream Miranda warning . . . did not effectively apprise the suspect of his

18    rights." (Ptn. at 24, citing United States v. Williams, 435 F.3d 1148, 1157 (9th Cir. 2006).)

19    Petitioner argues that he did not knowingly waive his privilege against self-incrimination. (Id. at

20    25-26.) He asserts that his statements to law enforcement were therefore inadmissible and should

21    have been excluded at trial. (Id. at 23.)

22        The state court of appeal set forth the relevant facts as follows:

23
> At 11:18 a.m. on February 10, 2005, detectives met with Howard in
> an interview room at the police station. They patted him down,

24
> offered him chips, told him to direct a question he had about using
> the telephone to "other detectives coming down here," and arranged

25
> for him to use the restroom. In searching Howard, one of the
> detectives noted Howard's size. Howard explained he was six feet

26
> five inches tall and wore size 16 shoes. Howard said he "belong[ed]
> on a football field." The detective asked if Howard ever [p]lay[ed]

27

28   [2] Miranda v. Arizona, 384 U.S. 436 (1966).

college ball."   Howard said he was "signed up to go" to "Mesa College."   The detective responded as follows: "Really? Damn. Hopefully – hopefully you call Mesa back some day. That'd be good."

The detectives then left the room. While alone in the room, Howard stated, "What is that supposed to mean? What the fuck is going on, man? What the fuck? [Murphy], what the fuck did you do?

Detectives reentered the room. They gave Howard chips, a burrito, and water.  After eating, Howard fell asleep.  The detectives woke him up around 2:45 p.m. They told him they had finished talking to everybody else.  They knew about "[Rogers] stealing the car," and "you and [Murphy] meeting up ... [a]nd figuring out how you're going to get the car back."  They falsely stated they had a videotape from the park security camera that showed what happened that night. They added that Murphy was going to take them on a "road trip" to show them the location of the gloves.

A detective further explained they were "in here to kind of talk to [Howard] and get [his] side of stuff."  The detective would "like to talk to [him]" but "[i]n order for [the detective] to talk to [Howard], [the detective] [had] to advise [Howard] of [his] rights."  Another detective interjected that there were at least two sides to every story and they did not know Howard's side. A detective then told Howard he had the right to remain silent, anything he said could be used against him in court, and he had the right to an attorney.

The detective asked if Howard "underst[oo]d that?" Howard nodded, and the detective said "[o]kay" and invited Howard to let them know what happened. The detectives then began a lengthy recorded interview with Howard.

Howard, 2010 WL 54290 at *5.  This summary is consistent with this court's review of the

record.  See Lod. Docs. 21, 22 (videotaped police interview of petitioner).

2.  State Court Opinion

Addressing the merits of petitioner's Miranda claim[3], the state court of appeal reasoned as

follows:

> *The Detectives Did Not Withhold Advising Howard Of His Miranda Rights And His Waiver Was Voluntary*
>
> Howard contends the "police tried to circumvent Miranda and undermine the will of a suspect to resist questioning" and analogizes the interrogation to that in Missouri v. Seibert (2004)

---

[3] Where there is no reasoned decision from the state's highest court, the court "looks through" to the last reasoned state court decision.  Y1st v. Nunnemaker, 501 U.S. 797, 801–806 (1991); Van Lynn v. Farmon, 347 F.3d 735 (9th Cir. 2003).

542 U.S. 600.  Seibert held that when Miranda warnings are withheld from a defendant until after a confession is elicited, those Miranda warnings are ineffective and the statements inadmissible. (Seibert, at pp. 615-617.)

This case is not Seibert. The police did not withhold Miranda warnings until Howard confessed. In fact, Howard made only one arguably incriminating statement before the Miranda warnings were given, and that was when there was no interrogation and when he was alone in the interview room.  Specifically, after the officer stated that "hopefully [Howard could] call Mesa [College] back some day" and left the room, Howard stated, "What is that supposed to mean? What the fuck is going on, man? What the fuck? [Murphy], what the fuck did you do?"  Howard's statement was spontaneous and did not follow words or actions reasonably likely to elicit an incriminating response. (Rhode Island v. Innis (1980) 446 U.S. 291, 300-301.)

Howard further contends the detectives "deprived [him] of access to a telephone[,] ... delayed his interview, lied to him and accused him of assisting ... crimes in an effort to undermine his free will."  To the extent Howard's argument is that his Miranda waiver was involuntary, it too fails.

A court considers the totality of the circumstances surrounding an interrogation in deciding whether a defendant effectively waived his Miranda rights. (People v. Whitson (1998) 17 Cal.4th 229, 245-247.)  Here, the police allowed Howard to eat and use the bathroom, made small talk with him, and then allowed him to take a nap.  When they woke him up, they confronted him with a scenario where they claimed to know details about Howard's history and the crime – some true and some not – and then said they wanted to "talk to [him]" "if [he] want[ed] to give [them] [his] side of the story" but had to "advise [him] of [his] rights."  Although Howard claims the detectives' comments led him to "believe he had no choice; he had to give his 'side of the story,'" this is not a fair representation of the interview.  The detectives specifically said they would "like to talk to [him]" "if [he] want[ed] to give [them] [his] side of the story...."  On this record, Howard's argument fails.

Howard, 2010 WL 542980 at **5-6.

3. Analysis

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment.  Blackburn v. Alabama, 361 U.S. 199, 207 (1960).  A court on direct review is required to determine, in light of the totality of the circumstances, "whether a confession [was] made freely, voluntarily and without compulsion or inducement of any sort."  Withrow v. Williams, 507 U.S. 680, 689 (1993) (internal quotation marks and citation omitted).  In light of the totality of the circumstances, "we ask:  Is the confession the product of an essentially free and

1   unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against

2   him.  If it is not, if his will has been overborne and his capacity for self-determination critically

3   impaired, the use of his confession offends due process."  Doody v. Ryan, 649 F.3d 986, 1008

4   (9th Cir. 2011) (internal quotation marks and citation omitted).

5        "[C]oercive police activity is a necessary predicate to the finding that a confession is not

6   'voluntary' within the meaning of the Due Process Clause."  Colorado v. Connelly, 479 U.S. 157,

7   167 (1986).  Police deception alone "does not render [a] confession involuntary," United States v.

8   Miller, 984 F.2d 1028, 1031 (9th Cir. 1993), nor is it coercive to recite potential penalties or

9   sentences, including the potential penalties for lying to the interviewer, United States v. Haswood,

10  350 F.3d 1024, 1029 (9th Cir. 2003).

11       "The question of the voluntariness of a confession is a legal issue that requires an

12  independent federal determination."  Rupe v. Wood, 93 F.3d 1434, 1444 (9th Cir. 1996).  A state

13  court's ultimate conclusion that a confession was voluntary is reviewed under Section 2254(d)(1)

14  of the AEDPA.  Lambert v. Blodgett, 393 F.3d 943, 976-978 (9th Cir. 2004).  However, a state

15  court's subsidiary factual conclusions are entitled to the presumption of correctness pursuant to

16  Section 2254(e)(1).  Rupe, 93 F.3d at 1444.

17       Here, having reviewed the video recording of petitioner's interview with police, the

18  undersigned finds that the state court's determination that, under the totality of the circumstances,

19  petitioner's confession was voluntary, was an objectively reasonable application of clearly

20  established federal law.  Thus this claim should be denied.

21  B.  Exculpatory Evidence

22  1.  Facts

23       Petitioner claims that he was denied his right to present a full defense in violation of the

24  Sixth and Fourteenth Amendments when the trial court excluded exculpatory evidence,

25  specifically a videotaped conversation between petitioner and Murphy while both were in police

26  custody.  Petitioner contends that the tape was "reliable evidence of Murphy's dominant

27  personality" and showed that, when the two of them interacted, she was "the dominant figure[.]"

28  (ECF No. 49-1 at 27-28.)  Petitioner asserts that, had the tape been admitted, it would have

1    bolstered his argument that Murphy was the planner and instigator of Rogers' murder, and

2    petitioner was the "duped pawn."  (Id. at 28.)

3        The state court of appeal set forth the relevant facts as follows:

4            The court denied Howard's request to admit a videotape of a joint
             conversation between him and Murphy he contends was the "best
5            evidence" supporting his defense he was "dominated" by her and
             did not know she intended to kill and rob Rogers. He argues
6            exclusion of "this crucial video" denied him his constitutional right
             to present a complete defense. There was no error.
7
8            The court excluded the tape (in Howard's trial only) under
             Evidence Code section 352.  It reasoned the tape was "not
9            particularly probative because Mr. Howard never accedes to any of
             the requests, demands, or begging from Miss Murphy."  Howard
10           had already "presented other evidence from [his] mother, sister, and
             acquaintances going to his gullibility and potential for being
11           influenced by others."  FN3.  The limited probative value was
             "outweighed by the potential for misleading and confusing the jury"
12           because it was "unrealistic" the jury was going to "disregard the
             substance of what the two defendants say to each other about who
13           was the shooter and rely only on the demeanor and nonhearsay
             purpose for which the evidence [wa]s offered."
14
             FN3. Because of this fact, the court earlier had found no denial of
15           Howard's due process rights.

16   Howard, 2010 WL 54290 at *7.

17       2. State Court Opinion

18       Reviewing the merits of petitioner's claim, the state court of appeal reasoned as follows:

19           The court's ruling was not an abuse of discretion. The court
             reasonably concluded the probative value of the tape was minimal
20           and was substantially outweighed by the probability it would
             confuse the jury.  As the court stated, the tape showed Murphy
21           repeatedly questioning Howard as to whether he told detectives she
             pulled the trigger and asking Howard to confess to the killing.
22           Howard, in response, stated he did not pull the trigger and
             explained he would get "life" if he said he "did it."  As such, the
23           tape was of limited probative value in establishing Howard was
             dominated by Murphy.  On the other hand, the court reasonably
24           found it unrealistic the jury could focus simply on the nonhearsay
             reason for its admission, i.e., Murphy's purported domination of
25           Howard, and ignore the truth of the statements that went to the
             identity of the shooter.
26
27           Finally, the court's ruling did not deprive Howard of his right to
             present a defense because he was allowed to put on other evidence
28           supporting his theory he was dominated by Murphy. According to
             Woodruff, Howard was "weak-minded," unintelligent, and did

                                        11

things he did not want to do. According to Knight, Howard was slow to understand things and gullible. This evidence, if accepted, would have tended to support Howard's theory he was dominated by Murphy.

Howard, nevertheless, contends exclusion of the tape denied him the opportunity to present a "'complete defense' "because neither of these witnesses was "closely acquainted with [Murphy] or knew the dynamics of the relationship...." He analogizes his situation to the defendants in <u>Chambers v. Mississippi</u> (1973) 410 U.S. 284, <u>Green v. Georgia</u> (1979) 442 U.S. 95, and <u>Holmes v. South Carolina</u> (2006) 547 U.S. 319. These cases are not similar to Howard's.

<u>Chambers</u> involved a situation where state court rules unconstitutionally prevented the defendant from either cross-examining his own witness (McDonald) who had repudiated a written confession and asserted an alibi or calling his own witnesses who would have discredited McDonald. [Citation.] <u>Green</u> involved a situation where state court rules unconstitutionally prevented the defendant from introducing evidence at the penalty phase of his trial that codefendant Moore had confided to a witness that Moore had killed the victim after ordering the defendant to run an errand. [Citation.] And <u>Holmes</u> involved a situation where a state court evidentiary rule barred the defendant from introducing proof of third-party guilt when the prosecution introduced forensic evidence that strongly supported a guilty verdict. [Citation.]

Unlike in these three cases, here the evidentiary rules were used simply to exclude minimally relevant evidence that marginally related to Howard's guilt. On this record, Howard's argument fails.

<u>Howard</u>, 2010 WL 54290 at **7-8. The above summary of the tape's contents is consistent with this court's review of the record. (CT 478-500.)

3. <u>Analysis</u>

The Sixth Amendment to the Constitution guarantees the right of a criminal defendant to have a public trial, to confront the witnesses against him and to obtain witnesses in his favor. These guarantees are incorporated by the due process clause of the Fourteenth Amendment, binding the states. Due process includes a right to "'a meaningful opportunity to present a complete defense.'" <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986).[4]

/////

---

[4] The undersigned does not review the propriety of the state court's application of its own evidentiary rules. "[F]ederal habeas corpus relief does not lie for errors of state law." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991).

1    The United States Supreme Court has not "squarely addressed" whether a state court's

2    exercise of discretion to exclude testimony violates a criminal defendant's right to present

3    relevant evidence.  Moses v. Payne, 555 F.3d 742, 758–59 (9th Cir. 2009).  Nor has it clearly

4    established a "controlling legal standard" for evaluating discretionary decisions to exclude such

5    evidence.  Id. at 758; see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the

6    issuance of Moses and the present, the Supreme Court has not decided any case either 'squarely

7    address[ing]' the discretionary exclusion of evidence and the right to present a complete defense

8    or 'establish[ing] a controlling legal standard' for evaluating such exclusions."), cert. denied, ——

9    U.S. ——, 132 S. Ct. 593 (Nov. 14, 2011).

10    Petitioner contends that the trial court's exclusion of the videotape is analogous to events

11    in Chambers v. Mississippi, 410 U.S. 284 (1973), in which state evidence rules prevented a

12    defendant in a murder trial from either cross-examining, or admitting the written confessions of, a

13    person who had been present at the crime scene and had admitted to shooting the victim.  The

14    Ninth Circuit has interpreted Chambers to "clearly establish[] that the exclusion of trustworthy

15    and necessary exculpatory testimony at trial violates a defendant's due process right to present a

16    defense."  Cudjo v. Ayers, 698 F.3d 752, 754-55 (9th Cir. 2012).  As set forth above, the state

17    court in this case determined that Chambers was inapplicable, as the videotape of petitioner's

18    interaction with Murphy at the police station was "minimally relevant evidence."

19    In Nevada v. Jackson, 133 S.Ct. 1990(2013), the Supreme Court restated the broad rule

20    governing claims that evidence was unconstitutionally excluded:

21    
22            "[T]he Constitution guarantees criminal defendants 'a meaningful
               opportunity to present a complete defense,'" Crane v. Kentucky,
               476 U.S. 683, 690 (1986) . . . , but we have also recognized that
23            "'state and federal rulemakers have broad latitude under the
               Constitution to establish rules excluding evidence from criminal
24            trials,'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006) [.]
               Only rarely have we held that the right to present a complete
25            defense was violated by the exclusion of defense evidence under a
               state rule of evidence.  See Rock v. Arkansas, 483 U.S. 44, 61
26            (1987) (rule arbitrary); Chambers v. Mississippi, 410 U.S. 284,
               302–303 (1973) (State did not even attempt to explain the reason
27            for its rule); Washington v. Texas, 388 U.S. 14, 22 (1967) (rule
               could not be rationally defended).

28    Id. at 1992 (some citations omitted).

1    Here, the videotape was excluded under Section 352 of the California Evidence Code,

2    which like Federal Rule of Evidence 403, requires a balancing test between the probative value of

3    the evidence and the probability that its admission will consume undue time or "create substantial

4    danger of undue prejudice, or confusing the issues or of misleading the jury."  Cal. Evid. C. §

5    352.  The conversation between petitioner and Murphy was confusing as to who actually "pulled

6    the trigger" and to what extent both participants were lying, or planning to lie, to the police.  (See

7    CT 480 (both parties deny "pulling the trigger").)  While it showed Murphy doing most of the

8    talking and attempting to manipulate petitioner by crying, accusing, and invoking her infant son,

9    it is not clearly exculpatory, as it does not show that petitioner was willing to "take the fall" for a

10   crime he did not commit.  (See CT 495 (petitioner asks Murphy if she really cares about him or is

11   just saying that, as "I'm getting ready to do life if I take this shit, if I say I did it.").)

12   As the state courts' conclusion that the trial court permissibly excluded this evidence was

13   not objectively unreasonable under § 2254(d), this claim should be denied.

14   C.  Diminished Capacity Defense

15   1.  Facts

16   Petitioner claims that his trial counsel was ineffective in failing to investigate and present

17   a defense based on diminished actuality.[5]  (ECF No. 49-1 at 32.)  He asserts that his defense

18   theory – that he was coerced and manipulated by Murphy – required further investigation into his

19   mental illness than defense counsel undertook, and that he was prejudiced by a lack of

20   "competent medical evidence" in support of this defense.

21   The background facts are as follows:

22   a.  Dr. Edwards' Report

23   When petitioner was appointed counsel in the instant federal action, his attorney found a

24   neuropsychologist, Dr. Daniel Edwards, to evaluate him.  (ECF No. 49-2 at 3-4.)  Dr. Edwards

25   _____

26   [5] "To support a defense of 'diminished actuality,' a defendant presents evidence of voluntary intoxication or mental condition to show he 'actually' lacked the mental states required for the

27   crime."  People v. Clark, 52 Cal. 4th 856, 880 n.3 (2011); see, e.g., People v. Hajek, 58 Cal. 4th 1144, 1166 (2014) (in "diminished actuality" defense, attorney argued that defendant's mental

28   illness prevented him from forming the mental states required for murder and attempted murder).

14

1    reviewed approximately 1,000 pages of petitioner's school and psychological records and, in

2    April 2012, evaluated him in person.  (Id. at 4.)  He prepared his final report on June 4, 2012.

3    (Id.)  It is attached to the amended petition as Exhibit B.  (ECF No. 49-3.)

4           Based on petitioner's records, Dr. Edwards noted a childhood history of neglect, sexual

5    abuse, depression, and ADHD.  At age 21, petitioner was diagnosed with Major Depressive

6    Disorder.  Shortly after his February 2005 arrest for the murder of Donte Rogers, petitioner was

7    diagnosed with Bipolar Disorder, complained of auditory hallucinations, had a psychotic

8    breakdown, and was prescribed an antipsychotic and second antidepressant.  (ECF No. 49-3 at 3.)

9           Tested in August 2005 by a Dr. McDermott, petitioner scored "in the definite malingering

10   range."  (Id.)  In sum, he "presents [as] that most difficult to diagnose and understand patient who

11   has psychotic symptoms and in addition malingers or makes up symptoms.  This makes it very

12   difficult to know what is real and what is made up."  (Id.)

13          As to petitioner's April 2012 evaluation, Dr. Edwards notes that he was reality-oriented,

14   "a little depressed," and not sleeping well.  He continued to hear voices telling him "he is stupid

15   and to kill himself or other people."  He also reported past visual hallucinations.  Two childhood

16   head injuries left petitioner unconscious and "could have resulted in brain damage[.]"  From the

17   time of the first injury until 2011, petitioner experienced seizures.  (Id. at 4.)

18          Tests of neurological deficits indicated brain dysfunction, leading Dr. Edwards to

19   conclude that petitioner "does not have a normal brain."  (Id. at 5.)

20                          He is affected in a number of areas such as Executive Functions,
21                          Attention and Concentration, Speed of Information Processing,
                            Spatial Skills, Verbal/Academic Skills, Verbal Learning, Memory,
22                          Motor Control, and Fine Motor Skills.

23                          These data should have been available as factors of mitigation
                            during Mr. Howard's trial.  The defense did have a
24                          neuropsychologist but she concluded that Mr. Howard was
                            malingering and untestable.  I think that more effort should have
25                          been spent on working with Mr. Howard to get him to the point
                            where he was [cooperative] with Neuropsychological testing so that
26                          these results could have been considered by his Judge and Jury.

27   (Id.)

28   /////

15

The report went on to detail the results of petitioner's tests, diagnosing him, in part, as follows:

| DSM IV | Axis I | Cognitive Disorder, NOS |
| | | Major Depressive Disorder with psychotic features |
| | | Schizophrenia, paranoid type |
| | Axis II | Borderline and Antisocial Personality features |

(Id. at 5-7.)

In conclusion, Dr. Edwards wrote that petitioner "is a psychiatrically very sick man[.] . . . His relationship with reality is changeable and colored by depression and paranoid ideation. He clearly has impaired brain function . . . . It is my opinion that these data should have been collected and presented by his defense attorneys at trial to be considered as factors in mitigation." (Id. at 7.)

b. State Supreme Court Review

Based on Dr. Edwards' evaluation, petitioner argued to the California Supreme Court that petitioner's trial attorney's failure to investigate and present a mental health defense was objectively unreasonable and undermined confidence in the trial's outcome. (ECF No. 58 at 15-19.) Specifically, petitioner asserted:

> While trial counsel argued a diminished actuality defense, he presented only two lay witnesses to support the defense, a friend and a sister. An independent expert psychologist would have been much stronger evidence and would have corroborated [these witnesses]. An expert psychologist would have presented evidence directly relevant to the defense of diminished actuality. This failure to present expert psychological evidence undermined confidence in the outcome and prejudiced Mr. Howard.

(Id. at 19.)

As requested by the state supreme court, both the state Attorney General's office and the Sacramento County Office of the Public Defender filed informal responses to the petition. (ECF Nos. 58-1, 58-2; see ECF No. 58-4 at 2.) Petitioner filed a reply to the informal responses. (ECF No. 58-3.)

In the Public Defender's response, Supervising Public Defender Jeffrey Barbour – who was petitioner's trial attorney – asserted that the petition "fails to mention or discuss the

1  substantial mental health investigation actually done on this case." (ECF No. 58-2 at 2.) Mr.

2  Barbour stated that, during the pendency of petitioner's case, he had petitioner "evaluated by both

3  a psychiatrist and by a neuropsychologist. Neither could provide a favorable opinion for trial."

4  (Id.)

5        Barbour recounted that, after reviewing "voluminous documents" concerning petitioner's

6  childhood, juvenile records, and psychological problems, he retained a forensic psychiatrist, Dr.

7  Jeffrey Gould, to "generally assess [petitioner] and to direct me on any mental health issues." (Id.

8  at 4-5.) Barbour provided Dr. Gould, whom he knew to be capable and experienced, with

9  petitioner's background records and the videotape of petitioner's statement to police. (Id. at 5.)

10  After reviewing these records and testing petitioner's ability to understand Miranda warnings, Dr.

11  Gould concluded that he could not provide helpful information to Barbour about petitioner's

12  cognitive functioning. He further concluded that petitioner did not appear to have Bipolar

13  Disorder, as he claimed. (Id.)

14        Barbour next retained a neuropsychologist, Dr. Nell Riley, to evaluate and test petitioner.

15  (Id.) Dr. Riley, who was employed by the Neurology Department at Stanford University

16  Hospital, reviewed petitioner's background records and performed psychological testing. She

17  concluded that petitioner's test behavior "was characterized by multiple indicators of insufficient

18  effort/malingering." (Id.) "She noted that the severe impairment he displayed during testing was

19  inconsistent with his conversation with her where he was able to express his opinions and answers

20  in a clear and articulate manner." (Id. at 6.) A test for malingering showed petitioner to be

21  "exaggerating impairment." (Id.)

22        Barbour also reviewed petitioner's jail psychiatric records. (Id.) These included a report

23  from Barbara McDermott, an associate professor of psychology at UC Davis, based on her 2005

24  evaluation of petitioner in jail. In a test designed to indicate whether the subject is malingering,

25  petitioner "scored in the definite malingering range on numerous scales, and in the probable

26  malingering range on numerous scales." (Id.)

27        Finally, Barbour obtained a civil commitment ("5150") report from the psychiatric

28  hospital where petitioner was evaluated in 2004, two months before Rogers' killing, when

17

petitioner was reportedly suicidal.  (Id.)  During the evaluation, petitioner "denied auditory and visual hallucinations" and was thought to be suffering from major depression.  (Id.)  In summary, Barbour asserted that he "thoroughly investigated" petitioner's mental health issues, contrary to petitioner's claim of ineffective assistance.  (Id. at 7.)

In the Attorney General's informal response, respondent's attorney argued that petitioner's state habeas claim should be denied, as petitioner failed to make a prima facie showing of ineffective assistance.   (ECF No. 58-1.)

c. Trial Defense

In the absence of expert testimony about petitioner's mental state, Barbour questioned lay witnesses on this subject.   Tawon Woodruff, a friend of Rogers, encountered petitioner several times in the weeks before Rogers' death.  (RT 1226.)   Rogers was a pimp, and petitioner acted as his "muscle man" and sometimes drove "the girls and Mr. Rogers from place to place[.]"  (RT 1227-1228.)  Woodruff testified that petitioner was "weak-minded" and sometimes "did things that he didn't want to do."  (RT 1233.)  When Rogers became angry at petitioner a few weeks before his death over a money issue, petitioner cried.  (RT 1234-1236.)

Leslie Knight, petitioner's older sister, testified that he was slow to understand things and gullible.  (RT 1287-1288.)  She testified that he "adored" Rogers and was his bodyguard (RT 1290), but had expressed "feelings of frustration" about Carmel Murphy.  (RT 1292.)

Petitioner's stepmother, Diana Howard, testified that Rogers was petitioner's "really good friend," whom he loved.  (RT 1318.)  Rogers' girlfriend, Tiana Smith, also testified that they were friends, that petitioner sometimes stayed with them, and that whenever Rogers got money, he would share it with petitioner.  (RT 1326-1327.)

In his closing argument, Barbour argued that petitioner loved Rogers and had no reason to seek revenge on him.  "Mr. Rogers was the source of Mr. Howard's income and his feeling of self-importance."  (RT 1584.)  While petitioner was gullible and "lacking in perception," Murphy was "the one running the show."  (RT 1585-1586.)

Caught in the middle of a dispute between Rogers and Murphy over a Jeep, petitioner went to the park on the night of the shooting expecting to "sort this thing out."  (RT 1604.)

1  After Murphy deceived petitioner "in convincing him to bring Donte Rogers to the park," she

2  shot Rogers, leaving petitioner "stuck, frozen, stunned by what happened." (RT 1584-1585.)

3      Barbour argued that, once Rogers was dead, petitioner "gravitated toward his old friend

4  Carmel Murphy, the only one he had left around." (RT 1586.) After talking to Murphy at the

5  police station, petitioner made a statement falsely incriminating himself. (Id.) He tried to "cast

6  the blame on himself . . . to mitigate what Carmel had done." (Id. at 1593.) But petitioner "did

7  not plan [the shooting]," nor did he know of Murphy's plan before it happened. (RT 1615-1616.)

8      Rejecting this theory, the jury convicted petitioner of first degree murder by means of

9  lying in wait. (RT 1644.)

10  2. Analysis

11      The California Supreme Court denied this claim without citations or comment. Where, as

12  here, the state court reaches a decision on the merits but provides no reasoning to support its

13  conclusion, a federal habeas court independently reviews the record to determine whether habeas

14  corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

15  2003). "Independent review of the record is not de novo review of the constitutional issue, but

16  rather, the only method by which we can determine whether a silent state court decision is

17  objectively unreasonable." Id. Where a state court's decision is unaccompanied by an

18  explanation, the habeas petitioner still has the burden of "showing there was no reasonable basis

19  for the state court to deny relief." Harrington v. Richter, 562 U.S. 86, 98 2011).

20      The Supreme Court has enunciated the standards for judging ineffective assistance of

21  counsel claims. See Strickland v. Washington, 466 U.S. 668 (1984). First, a defendant must

22  show that, considering all the circumstances, counsel's performance fell below an objective

23  standard of reasonableness. Strickland, 466 U.S. at 688. To this end, the defendant must identify

24  the acts or omissions that are alleged not to have been the result of reasonable professional

25  judgment. Id. at 690. The court must then determine, whether in light of all the circumstances,

26  the identified acts or omissions were outside the wide range of professional competent assistance.

27  Id. Second, a defendant must affirmatively prove prejudice. Id. at 693. Prejudice is found where

28  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

19

1  proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability

2  sufficient to undermine confidence in the outcome."  Id.  See also United States v. Murray, 751

3  F.2d 1528, 1535 (9th Cir. 1985); United States v. Schaflander, 743 F.2d 714, 717-718 (9th Cir.

4  1984) (per curiam).

5        As to ineffective assistance claims in the federal habeas context, the Supreme

6  Court has instructed: "The standards created by Strickland and § 2254(d) are both 'highly

7  deferential,' . . . and when the two apply in tandem, review is 'doubly' so[.]  . . . . When §

8  2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is

9  whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

10  Richter, 562 U.S. at 105 (internal citations omitted).

11        Based on the foregoing record, petitioner has shown neither ineffective assistance nor

12  prejudice under the Strickland/AEDPA standard.  See Stokeley v. Ryan, 659 F.3d 802, 814 (9th

13  Cir. 2011) ("In sum, '[t]his is not a case in which the defendant's attorneys failed to act while

14  potentially powerful mitigating evidence stared them in the face.  It is instead a case, like

15  Strickland itself, in which defense counsel's decision not to seek more mitigating evidence from

16  the defendant's background than was already in hand fell well within the range of professionally

17  reasonable judgments.") (internal citations and quotation marks omitted).

18        In his traverse, petitioner argues that Mr. Barbour's informal response, while considered

19  by the state supreme court, should not be relied on by this court because it is unsworn and

20  untested by cross-examination.  (ECF No. 60-1 at 26-27.)  While petitioner's point is well-taken,

21  he cites no case, and the court is not aware of one, holding that a party's informal response in the

22  California Supreme Court should not be considered on federal habeas review.  See Nguyen v.

23  Dickinson, 2013 WL 3389075, *4 (N.D. Cal. July 8, 2013) ("Even assuming that petitioner is

24  correct that under Section 2254 a federal court reviewing a state court's denial of habeas relief

25  must consider the position taken by the state in informal responses filed with the state court,

26  petitioner's argument fails.").

27        Here, even assuming petitioner is correct that a federal habeas court may *not* consider

28  unsworn statements in an informal response to the state supreme court, petitioner has failed to

1    carry his burden to show ineffectiveness and prejudice.  Thus this claim should be denied.

2          Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas

3    corpus (ECF No. 49-1) be denied.

4          These findings and recommendations are submitted to the United States District Judge

5    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

6    after being served with these findings and recommendations, any party may file written

7    objections with the court and serve a copy on all parties.  Such a document should be captioned

8    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

9    shall be served and filed within fourteen days after service of the objections.  The parties are

10   advised that failure to file objections within the specified time may waive the right to appeal the

11   District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12    Dated:  April 10, 2015

13                                        _____
                                          CAROLYN K. DELANEY
14                                        UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20    2 / howa0991.hc

21

22

23

24

25

26

27

28

21